IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                          Case No. 4:22-cr-00319-LPR

BRUCE McARTHUR SMITH, KEVIN
LANGEL, AND LARRY ROGERS                                            DEFENDANTS

## ORDER

This is a criminal contempt Order.  On February 9, 2026, during a criminal trial, I verbally informed Mr. Sylvester Smith—the attorney for one of the defendants—that I was summarily holding him in contempt.[1]  As I explained at the time, my authority to summarily hold Mr. Smith in contempt is set forth in Federal Rule of Criminal Procedure 42(b):

> Notwithstanding any other provision of these rules, the court . . . may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies. . . .  The contempt order must recite the facts, be signed by the judge, and be filed with the clerk.[2]

Consistent with this rule, I certify that I saw and heard the contemptuous conduct that is set forth below and forms the basis of this Order.

### I.  BACKGROUND

During his closing argument, Mr. Sylvester Smith made an ad hominem attack against the representative of the United States of America: DEA Agent Brad Abbott.  Agent Abbott had been

---

[1] *See* Tr. of Jury Trial Vol. 5 (Doc. 530) at 1172:13–1173:6, 1176:5–1177:8.

[2] FED. R. CRIM. P. 42(b).  The Court is granted similar authority by 18 U.S.C. § 401:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

seated with the Government's legal team for the entirety of this week-long case.[3]  In addition,

Agent Abbott had been a significant witness for the Government, appearing twice on the stand

during the Government's case-in-chief.[4]  Agent Abbott was the DEA case agent who led the drug

trafficking investigation for which the Defendants were on trial.[5]  As case agent, Agent Abbott was

"the primary agent that . . . overs[aw] all aspects of the investigation."[6]  In many respects, Agent

Abbott's testimony was the linchpin of the Government's case.[7]

So, what specifically did Mr. Smith say in closing about the Government's representative

and witness?  Mr. Smith called Agent Abbott a "greasy little pig."[8]

> **Mr. Smith:** Now, the Government had the burden of proving this was a conspiracy,
> not just any conspiracy, a drug conspiracy.  So they need to prove that Mr. Langel
> and others agreed to distribute or to possess with the intent to distribute a controlled
> substance, that he voluntarily and intentionally joined in that agreement.  Now, they
> also need to prove that he knew what this agreement was for.
>
> Here is the key problem with this case: The box.  There is a lot of WhatsApp
> messages about some boxes.  What's in the box?  What's in the box, ladies and
> gentleman of the jury?  Agent Abbott, I will give him this, told the truth on this key
> point.  I said, "Agent Abbott, if you never found the drugs, how you know what
> drug it was?"  Bam.  "I know what they mean when they say this."  "You think you
> know what they mean when they say this, Agent Abbott.  If you never found the
> drugs, how do you know how much it was?"

---

[3] *See* Tr. of Jury Trial Vol. 1 (Doc. 526) at 111:21–24.

[4] *See id.* at 111:3–4; Tr. of Jury Trial Vol. 4 (Doc. 529) at 857:20–21.

[5] *See* Tr. of Jury Trial Vol. 1 (Doc. 526) at 111:21–24.

[6] *Id.* at 111:25–112:4.

[7] For example, Agent Abbott testified to details "about the long-term investigation into drug traffickers in the Levy area of North Little Rock that culminated in a wiretap on the telephone of Roderick Toney."  Tr. of Jury Trial Vol. 5 (Doc. 530) at 1064:6–9.  Agent Abbott provided testimony on the communications gathered by the wiretap.  *See id.* at 1064:17–22.  These communications were likely necessary to the Government proving beyond a reasonable doubt that all three Defendants were involved in a drug trafficking conspiracy.  *See generally id.* at 1062–1100; 1138–1164.  Indeed, "Agent Abbott went through all . . . text messages [obtained by the wiretap] and broke down each individual one, [and testified to] what they meant in his 26 years of experience."  *Id.* at 1160:2–4.  The Government also relied on Agent Abbott's (along with Sergeant Stephen Briggs') testimony to establish specifics like the market price for a kilogram of cocaine, s*ee id.* at 1093:24–1094:11, and the quantity of trafficked drugs, *see id.* at 1094:24–1095:8.  These are only a few of the many ways that Agent Abbott was a key Government witness.

[8] Tr. of Jury Trial Vol. 5 (Doc. 530) at 1120:21–22.

Well, Agent Abbott, *greasy little pig*, he didn't want to give it to me.  I had to tie --

Mr. Givens:  Excuse me, Your Honor.  May we approach?

The Court:  Yes.  Come on up here.[9]

The Court thereupon held a bench conference outside the hearing of the jury.[10]  And it was obvious from the start of that conference that Mr. Smith knew the gravity of what he had done.

Mr. Smith:  That was a slip of the tongue.

The Court:  What did you just call him?  You're going to get in front of the jury and you are going to apologize for being disrespectful in my court.

Mr. Smith:  Absolutely, Absolutely.

The Court:  And you're going to tell them there is no reason for you to call him that and that you are entirely wrong.

Mr. Smith:  I am absolutely going to do that, Judge.[11]

Mr. Smith then went on with his closing argument.  And Mr. Smith's apology left much to be desired.

Mr. Smith:  Ladies and gentleman, I want to apologize to you, and I want to apologize to Agent Abbott.  I am from the country, and I used a colloquialism about farm animals and especially one that can be slippery, but it also has a very negative connotation towards law enforcement.

The Court:  Let me stop Mr. Smith right there.  Mr. Smith is now not doing what I told him he had to do.  I told Mr. Smith he had to apologize for that outrageous comment, and instead Mr. Smith is now trying to explain to you why he made that comment.  Apologize and move on.

Mr. Smith:  Yes.  I'm sorry, I should not have said that.  And, again, Agent Abbott, I'm sorry.  And, again, I'm sorry, ladies and gentleman.  And I'm sorry to the Court.

The Court:  You should be.

---

[9] *Id.* at 1120:5–24 (cleaned up) (emphasis added).

[10] The Court notes that the Government beat the Court to the punch by about a tenth of a second.  Even had the Government not objected, the Court was in the process of stopping Mr. Smith's closing and calling all counsel to the bench.

[11] *Id.* at 1121:1–8.

> **Mr. Smith:**  What I meant to say was that he didn't want to concede that at first, and I had to squeeze on it.  And, finally, he did say that, without having the drugs, he could not say for certain what they were or how much that they were.[12]

Later on in his closing, Mr. Smith added: "Now, ladies and gentlemen of the jury, I want to thank you, again, for your service to this case, for the time you put in.  I also do want to apologize again.  Agent Abbott, that was abhorrent.  That was not intentional.  I'm sorry.  I want to apologize to you and to the Court."[13]

After the Government's rebuttal closing and the Court's final instructions to the jury, the jury retired to deliberate.  At that time, the Court explained to Mr. Smith that it was the Court's intention, under the summary disposition procedure set out in Rule 42, "to find [him] in contempt of court in the same way [it would] if [he] had used curse words or if [he] had used a racial epithet or . . . a sex-based epithet or . . . a religious-based epithet."[14]  The Court further explained that "what [Mr. Smith] said about the Government's representative, not just a witness on the stand, but the Government's representative[,] was outrageous and an affront and an obstruction to the administration of justice going well beyond misbehavior."[15]  Finally, the Court explained that it did "not believe for a second that [the comment] was not intentional."[16]  To the contrary, the Court believed "100 percent [that] it was intentional."[17]  In this regard, the Court noted that "[i]nstead of following [the Court's] instructions" as to how "to clean it up" with the jury, Mr. Smith "started to explain what [he] meant by the term, which compounded the problem."[18]

---

[12] *Id.* at 1121:10–1122:3.

[13] *Id.* at 1135:6–10 (cleaned up).

[14] *Id.* at 1172:16–19.

[15] *Id.* at 1172:19–23.

[16] *Id.* at 1172:24.

[17] *Id.* at 1172:25.

[18] *Id.* at 1173:1–4.

The Court then offered Mr. Smith an opportunity to respond and provide "any explanation" he wanted "to give."[19]   Mr. Smith acknowledged that his comment "was insulting and . . . offensive."[20]  But Mr. Smith contended that his comment "was not intentional," that in the moment he simply "used the wrong analogy," that "[b]eing a southern country guy, that's an analogy [people] use a lot."[21]  He then claimed that he "had limited sleep" because he "was awoken at 1:00 a.m. with a bat in [his] house that [he] was chasing . . . ."[22]  Mr. Smith also explained that he "would never insult law enforcement anywhere, most certainly not in a federal courtroom . . . ."[23]   And that a comment like that "turns jurors off" and there is thus "no benefit . . . to do it."[24]   Finally, Mr. Smith said he "wasn't trying to avoid the Court's directive to apologize[,]" but rather that he "was trying to apologize" when the Court cut him off.[25]

## II.  FINDINGS OF FACT

The Court rejected Mr. Smith's explanation then, and, with the benefit of time and space, rejects it again today.  First, the Court adopts the findings it made on the record at the time of the trial.  Second, the Court notes that it was listening very closely to Mr. Smith's closing—not just the words, but the cadence, the delivery, and the style.  It did not sound like Mr. Smith was groping for words and came up with the wrong analogy.  It sounded to the Court like this analogy was a planned part of Mr. Smith's closing argument.  The Court is absolutely certain of this finding.[26]

---

[19] *Id.* at 1173:5–6.

[20] *Id.* at 1174:21–22.

[21] *Id.* at 1173:7–11.

[22] *Id.* at 1173:18–24.

[23] *Id.* at 1174:5–7.

[24] *Id.* at 19–20.

[25] *Id.* at 1174:9–11.

[26] This finding is consistent with the fact that counsel had a weekend break after the close of evidence to finalize and rehearse their closing arguments.  *See* Tr. of Jury Trial Vol. 4 at 953:24–955:3, 1007:23–1008:19 (discussing breaking

The Court also notes that it cannot and does not accept the idea that the phrase "greasy little pig" just happened to slip out of Mr. Smith's mouth accidentally when he was commenting on the testimony of a law enforcement agent.[27]  Mr. Smith well knows the history of law enforcement being called "pigs."[28]  And Mr. Smith has litigated many criminal cases over the years, including many trials.  By now, he is an expert at opening statements and closing arguments.  This was no accident.  It was a flamboyant trial lawyer trying to get away with as much as he could.[29]

The Court also notes that Mr. Smith's conduct immediately after the bench conference tends to reinforce the Court's foregoing conclusions.  Although Mr. Smith apologized to the jury, he used the opportunity to re-raise (in less explicit terms) the pig analogy.[30]  Whether this was a misguided attempt to explain away his outrageous comment or instead a nefarious attempt to solidify his characterization of Agent Abbott in the minds of the jury, the decision to revisit the pig analogy reveals a cavalierness about his misconduct that suggests intentionality.

### III.  CONCLUSIONS OF LAW

There is no exhaustive list of what conduct constitutes contempt of court.  18 U.S.C. § 401's language is very broad.[31]  And although 18 U.S.C. § 402 focuses on a person's willful disobedience of "any lawful writ, process, order, rule, decree, or command of any district court of

---

for the weekend to allow counsel time to prepare closing arguments).  This was not a situation where counsel had to roll into closing arguments immediately after, or even shortly after, the close of evidence.

[27] Imagine a lawyer, in his closing argument, calling a tough female witness a "feisty little b****."  Or imagine a lawyer, in closing argument, characterizing a colloquy that he had with a Jewish witness over some particular numerical figure as "jewing him down."  No jurist would accept these comments as accidental slips of the tongue.

[28] Mr. Smith acknowledged before the jury that the term "pig" "has a very negative connotation towards law enforcement."  *See* Tr. of Jury Trial Vol. 5 (Doc. 530) at 1121:10–14.

[29] This is the Court's considered opinion regardless of whether Mr. Smith's strange early-morning-bat-chasing tale is true or not.  *See id.* at 1173:18–24.

[30] *See id.* at 1121:10–1122:3.

[31] *See supra* note 2.

the United States[,]"[32]  the same statutory provision also makes clear that this is not the only way a person can commit a punishable contempt of court.

> **This section shall not be construed to relate to contempts committed in the presence of the court**, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, **but the same, and all other cases of contempt not specifically embraced by this section may be punished in conformity to the prevailing usages at law.**[33]

Courts have always had, and this Court has, the inherent authority to punish egregiously disrespectful behavior in the courtroom.[34]  Because men are not angels,[35] the contempt power is an unfortunately necessary tool for the Court to preserve order, decorum, and civility: vital ingredients to the administration of justice and the rule of law.[36]  The contempt power should be rarely used and only when there is no other option to deter behavior that simply cannot be tolerated.[37]

---

[32] 18 U.S.C. § 402.

[33] *Id.* (emphasis added).

[34] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that '[t]he power to punish for contempts is inherent in all courts.'  This power reaches both conduct before the court and that beyond the court's confines . . . ." (quoting *Ex parte Robinson*, 86 U.S. 505, 510 (1873))); *Pounders v. Watson*, 521 U.S. 982, 987 (1997) ("Longstanding precedent confirms the power of courts to find summary contempt and impose punishment."); *Robinson*, 86 U.S. at 510 ("The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice.  The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.").

[35] *See* THE FEDERALIST NO. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961) ("If men were angels, no government would be necessary.  If angels were to govern men, neither external nor internal controls on government would be necessary.  In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.").

[36] *See Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 593–94 (1947) ("The dual function of contempt has long been recognized—(1) vindication of the public interest by punishment of contemptuous conduct; (2) coercion to compel the contemnor to do what the law requires of him. . . .  The purpose of contempt proceedings is to uphold the power of the court, and also to secure to suitors therein the rights by it awarded." (internal citations and quotations omitted)).

[37] *See Chambers*, 501 U.S. at 44 ("Because of their very potency, [the Court's] inherent [contempt] powers must be exercised with restraint and discretion."); *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005) ("Because of the potency of inherent powers, '[a] court must exercise its inherent powers with restraint and discretion . . . .'" (quoting *Harlan v. Lewis*, 982 F.2d 1255, 1262 (8th Cir. 1993))).

It is beyond dispute that courts may use, and have used, the contempt power to punish intentional vulgarity in the courtroom.[38] No one doubts that a court may hold in contempt a lawyer who intentionally says "fuck you" to a witness, to opposing counsel, or to the opposing party.[39] For much the same reason, a court may hold in contempt a lawyer who intentionally uses a racial, sexual, or religious epithet to refer to or describe a witness, opposing counsel, or an opposing party.[40] And, for the same reason, this Court may hold Mr. Smith in contempt for referring to Agent Abbott—the representative of the United States at trial and a Government witness—as a "greasy little pig." Even Mr. Smith acknowledged that the reference was "abhorrent," "insulting," and "offensive."[41] And the Court has already found as a factual matter that Mr. Smith made the comment intentionally.[42]

---

[38] *See Pounders*, 521 U.S. at 987–88 ("'To preserve order in the court room for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of common law . . . .' Where misconduct occurs in open court, the affront to the court's dignity is more widely observed, justifying summary vindication." (quoting *Cooke v. United States*, 267 U.S. 517, 534 (1925))); *Vann v. Smith*, No. 13-cv-893, 2015 WL 520565, at *7 (D. Minn. Feb. 9, 2015) (removing petitioner from the courtroom "because of a vulgar outburst"); *In re Sealed Case*, 627 F.3d 1235, 1236 (D.C. Cir. 2010) (affirming summary criminal contempt where appellant exclaimed "[f]*** y'all" in the judge's presence); *United States v. Moore*, 22 F.4th 1258, 1271 (11th Cir. 2022) (affirming summary contempt of criminal defendant who interrupted court proceedings and told the judge that the judge was "full of s***"); *Simpson v. Battaglia*, 458 F.3d 585, 588 (7th Cir. 2006) (criminal contempt for saying "[f]*** you" to the judge); *Karcz v. N. Tonawanda*, No. 20-cv-1045, 2023 WL 6847319, at *1 (W.D.N.Y. Oct. 17, 2023) (holding defendant in contempt where the defendant directed a tirade of expletives at opposing counsel during a hearing). *See also United States v. Wilson*, 421 U.S. 309, 315 (1975) (a witness' refusal to testify in open court—despite a court order to do so—"justifie[s] summary contempt under Rule 42"); *Illinois v. Allen*, 397 U.S. 337 (1970) (barring a criminal defendant from the courtroom where the defendant disrupted trial proceedings by threatening the judge and making other inappropriate outbursts); *Sacher v. United States*, 343 U.S. 1, 5 (1952) (upholding summary contempt conviction of counsel where the misconduct "took place in the immediate presence of the trial judge [and] consisted of breaches of decorum and disobedience in the presence of the jury").

[39] *See supra* note 38.

[40] For example, the Court would swiftly hold in contempt a lawyer that used the N-word to describe a black witness, a lawyer that used the C-word to describe a female witness, or a lawyer that used the K-word to describe a Jewish witness.

[41] Tr. of Jury Trial Vol. 5 (Doc. 530) at 1135:6–10, 1174:15–22.

[42] *See supra* pp. 5–6.

Use of the contempt power is the only practical way to put a stop to the use of such inflammatory comments. Depending on the makeup of a particular jury and the strength or weakness of a case, a lawyer may well have a strong incentive to make an inflammatory remark like the one made in this case. It is an easy way to inflame the passions of a jury (or at least a single juror) against a witness, and it is hard to undo by curative instruction. Accordingly, courts must rely on the specific and general deterrence that comes from the deployment of the contempt power in this situation.[43] That is really the only feasible way to ensure lawyers don't travel down this road.

In light of the foregoing, the Court concludes that Mr. Smith committed contempt of court by intentionally calling Agent Abbot a "greasy little pig" in front of the jury during closing arguments. At trial, the Court informed Mr. Smith that it would fine him $2,500 for his contemptuous conduct. However, upon reflection, the Court believes it can achieve the necessary specific and general deterrence with a smaller fine. A $1,000 fine provides sufficient deterrence and also better reflects the severity of the conduct at issue. Although $1,000 is less than $2,500, it is still a very stiff fine for contemptuous conduct that broadly falls in (or near to) the vulgarity bucket. And although Mr. Smith's contempt was serious, it was not the "worst of the worst."[44]

Having now been found in contempt, Mr. Smith is directed to pay $1,000 to the Clerk of the United States District Court for the Eastern District of Arkansas. This money is immediately due in full. Interest will not be charged unless Mr. Smith fails to pay the full amount on or before 30 days from the date of this Order.

---

[43] *See Pounders*, 521 U.S. at 987.

[44] To determine the appropriate size of the fine, the Court also considered that this is not the first time Mr. Smith has broken the rules in this Court. He did so in this very case. *See* Docs. 471–485 (denying Mr. Smith's suppression motion as untimely). And he has also done so in a previous case. *See The Firm, PLLC v. Optumhealth Care Solutions, LLC*, No. 4:25-cv-00134-LPR at Doc. 34 (Order to Show Cause for ignoring the Court's orders).

IT IS SO ORDERED this 6th day of April 2026.

                                                  LEE P. RUDOFSKY
                                                  UNITED STATES DISTRICT JUDGE